Argued January 16, decided February 11, rehearing denied April 29, 1913.

## SORENSON v. SMITH.

(129 Pac. 757; 131 Pac. 1022.)

**Brokers—Commission—Evidence—Employment.**

1. Evidence, in an action for a real estate broker's commission, *held* to show that plaintiff's assignor was never employed by the defendant owner.

**Brokers—Employment Contract—Construction.**

2. The power of a real estate broker to grant an option for a limited time, and to extend such time, is in the nature of a personal trust, so as to negative an implied power to appoint a subagent for whose services the principal will be liable.

[As to the effect on employment of optional or provisional contract by broker, see note in 139 Am. St. Rep. 237.]

**Trial—Examination of Witnesses—Answer not Responsive—Motion to Strike.**

3. When a witness answers a question before an attorney can object, the proper practice is to move to strike out the answer, unless the court, in sustaining the objection, also directs the jury not to consider such answer.

**Brokers—Commission—Liability of Owner to Subagent.**

4. Where a real estate broker, merely under his general authority, employs a subagent to procure a purchaser, the principal is not thereby made liable for the subagent's commission.

[As to subagents and their relation to the principal and to the agent appointing them, see note in 50 Am. St. Rep. 110.]

**Vendor and Purchaser—Offer to Sell Land—Time of the Essence.**

5. Time was of the essence of an offer to sell land to a certain purchaser, providing he accepted the proposal within a time stated.

**Brokers—Duration of Employment.**

6. Where a broker is employed to procure a purchaser within a fixed time, his agency, unless extended, terminates at the expiration of that time.

**Brokers—Commissions—Liability of Owner to Subagent.**

7. Where a subagent, employed by a real estate broker under his general authority, was directed by the broker to continue his efforts after an option, which he had procured a purchaser to take on the land, had been declared canceled, the principal was not liable for a commission on a sale by reason of the subagent's acts pursuant to these directions.

**Brokers—Commissions—Liability of Owner to Subagent.**

8. That an owner consented to sell to a purchaser procured by a subagent of his broker, with knowledge that the purchaser had been so procured, did not constitute a ratification of the subagent's employment or render him liable to the subagent for a commission; the provision of the statute of frauds (L. O. L., § 808), that an oral agreement employing an agent or broker to sell real estate for a commission shall be void, requiring that a principal's ratification of an oral agreement respecting a broker's compensation be in writing.

**Words and Phrases—"Void."**

9. Where a statute declares a particular act to be void, and its performance, without authority, is denounced as a misdemeanor, for which a penalty is prescribed, the word "void," as thus used, is occasionally held to mean what its technical sense would imply and not to mean "voidable."

**Trial—Taking Case from Jury—Motion for Nonsuit or Directed Verdict.**

10. Motions for a judgment of nonsuit and for a directed verdict in defendant's favor are tantamount to demurrers to the evidence, and the same rule for determining the sufficiency of the testimony is applicable to each.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

Statement by MR. JUSTICE MOORE.

This is an action by Mrs. N. V. Sorenson against C. A. Smith to recover $15,000 as broker's commission for services alleged to have been performed by her husband and assignor, George Sorenson, in procuring purchasers who entered into a valid contract with the defendant, whereby they stipulated to pay him $300,000 for his interest in real property in Douglas County, Oregon. The cause, being at issue, was tried, resulting in a judgment for plaintiff as demanded in the complaint, and the defendant appeals.

REVERSED: REHEARING DENIED.

For appellant there was a brief over the names of *Messrs. Giltner & Sewall, Mr. Albert H. Tanner* and *Mr. Edwin H. Flick,* with oral arguments by *Mr. R. R. Giltner* and *Mr. Tanner.*

For respondent there was a brief over the names of *Mr. Martin L. Pipes, Mr. John M. Pipes* and *Mr. George A. Pipes,* with an oral argument by *Mr. Martin L. Pipes.*

MR. JUSTICE MOORE delivered the opinion of the court.

It is maintained that errors were committed in denying a motion for a judgment of nonsuit when the plaintiff had introduced her evidence and rested, and in refusing to direct a verdict for the defendant, when the cause was finally submitted. There has been brought up a transcript of the entire testimony, which will be examined with reference to the application for an instructed verdict, since that request necessarily supersedes the motion for a judgment of nonsuit. The facts are that the defendant was the owner and holder of certificates issued by the Northern Pacific Railroad Company for 7,480 acres of timber land in township 27 south, of range 2 west, of the Willamette meridian. Smith, who it appears resided in Minnesota, employed F. A. Kribs, a real estate broker of Portland, Oregon, to negotiate a sale of his estate in the premises, which interest will be designated herein as lands. Kribs informed George Sorenson, who was engaged in the same business in that city, that these lands were for sale, and gave him a map on which the real property was represented. The plaintiff's assignor thereupon procured J. O. Storey, who on September 28, 1906, was granted by Kribs an oral option of 60 days within which to purchase the premises at $25 an acre, on account of which he was to have paid $50,000 before the expiration of

that limit, and the remainder at stated intervals. The time thus specified was allowed in order to permit an inspection of the quantity and quality of the timber growing on the real property so as to determine its value. After a partial examination, Storey was reasonably satisfied that the lands were worth the sum demanded; but, being unable to secure a complete cruise of several subdivisions of the tract within the time limited, he obtained from Kribs an extension for that purpose until December 15, 1906. In the meantime, Storey had engaged to sell the lands for $250,000 to other persons, in whose interests he on December 9, 1906, offered to pay Kribs $10,000 as evidence of good faith, but the proposal was declined. At the expiration of the time ultimately limited, but before a complete inspection of the timber could be made by Storey, and without his offering to pay the $50,000 required, Kribs, at the defendant's direction, withdrew the lands from sale, and so notified Sorenson and Storey. The latter on July 7, 1907, commenced an action against Kribs in the Circuit Court of the State of Oregon for Multnomah County to recover $63,000 as damages for an alleged breach of the agreement to sell and convey the land, and the further sum of $2,027 as expenses incurred in cruising the timber.

A written contract was prepared at Minneapolis July 23, 1909, whereby the defendants, in consideration of $300,000, to be paid as specified, stipulated to sell and assign all his interest in the real property to C. P. Bratnober of that city, and that Storey-Bracher Lumber Company, an Oregon corporation, of which J. O. Storey and G. Bracher were respectively the president and secretary. This contract, referring to the purchasers and to the defendant, contained a clause as follows: ''The vendees agree to save the vendor harmless from any claim or demand on him by anyone save

65 Or.—6

and excepting Frederick A. Kribs of Portland, Oregon, for commissions in the sale of the certificates hereinbefore mentioned, and also agree to save the said Frederick A. Kribs harmless from any claim or demand made by anyone on him for commissions on account of the sale of said certificates." This contract was executed by the several parties to it at Albany, Oregon, September 2, 1909. Thereafter Sorenson assigned his claim for a commission of five per cent of the stipulated purchase price to the plaintiff, who instituted this action, which eventuated as hereinbefore narrated.

1. George Sorenson testified, in substance, that after December 15, 1906, pursuant to Kribs' promise to pay him a commission of five per cent of the purchase price of the land, if a profitable sale thereof could be made, he continued to negotiate with Storey until July, 1909, when Kribs said to him, "If you can get Storey to give $300,000, I can put the sale through," declaring, however, that Smith should be personally consulted about the matter. This information was communicated to Storey, who immediately went to Minneapolis, where the terms of the contract were settled. Sorenson admitted he never conversed with the defendant until after the sale was consummated; nor did he have any writing authorizing him to procure a purchaser of the lands or promising to pay him a commission in case of a sale. This testimony was corroborated in many particulars by that of F. A. Kribs, who was asked, in reference to Sorenson's efforts, originally to procure Storey as a purchaser, "You acted upon your general authority from Mr. Smith to sell the land?" He replied, "Yes, sir." After this answer was given, defendant's counsel said, "Now, if the court please, I object to that question." A ruling was then made as follows: "The objection is sustained." In obedience to a *subpoena duces tecum,* Kribs produced and identified copies of

letters which he had written to the defendant, and also telegrams which the latter had sent to him. These writings, having been received in evidence, show that, before the final bargain for the sale of the land was concluded, Smith knew that Sorenson claimed a commission for the services which he had performed.

J. O. Storey, referring to the visit at Minneapolis to confer with the defendant in July, 1909, testified as follows: "We had agreed on the negotiations for this land, and Mr. Sorenson, who was working with me at that time to get this land in our hands in some shape so we could jointly sell it again, telegraphed me and asked me what shape I had it, and replying I wired: 'Have Smith deal cinched. What can you get?' Answer.'" Referring to that message he said: "What I meant by that was, How much money can you get for the land?" This witness further said that the Storey-Bracher Lumber Company paid no money for the lands, and had no interest therein, except the right to sell the premises; that Mr. Bratnober agreed to buy the property and allow us to sell it; but that neither Sorenson nor himself was able to find a purchaser at the price demanded. Storey received a letter written December 9, 1906, by Sorenson, wherein the writer, referring to Kribs and to the original option to purchase the lands, said: "He wanted to divide the commission with me and leave you out of the deal. I told him you was in on the deal, and that you was to get an equal division."

The foregoing is deemed to be a sufficient statement of all the material evidence involved in a consideration of the question whether or not, under the original option to sell the property, or by subsequent ratification, Smith became liable to Sorenson for the payment of a commission. It will be remembered that the defendant, a nonresident of Oregon, appointed F. A. Kribs, a real estate broker of this state, to sell lands therein. If Kribs had been a nonresident of Oregon, and Smith

had known that he did not expect to come into the state, it might reasonably have been concluded that the selection of the agent, under such circumstances, carried with it, by necessary implication, the right to delegate his authority to a subagent. The modification of the general rule in this respect is founded on the assumption that, since the person originally appointed to negotiate a sale of land cannot, by reason of his nonresidence, be expected to visit and inspect the real property, he must of necessity select in his stead someone who can identify the premises to a prospective purchaser: *Eastland* v. *Maney,* 36 Tex. Civ. App. 147 (81 S. W. 574). This principle, however, can have no application to the case at bar, since Kribs resided in the state where the land is situated.

2. It is also to be kept in mind that Kribs originally allowed an option of 60 days, and further extended the time in which the timber might be inspected. The privilege thus granted implies a bestowal of power, the exercise of which evidences a personal trust and confidence that, in the absence of express authority, negatives a right to appoint a subagent, for a performance of whose services the principal would be liable: Story, Agency, §§ 12, 13; 1 Am. & Eng. Ency. Law (2 ed.), 972. From a careful examination of the entire evidence, it is believed that Sorenson was only a subagent, and that no privity existed between him and the defendant. This conclusion seems to be confirmed by Sorenson's letter to Storey, wherein he stated that Kribs wanted to divide with the writer the commission, and to exclude Storey from any participation therein. The statement in the letter that Sorenson had told Kribs that Storey "was in on the deal" and "was to get an equal division" reasonably implies that Kribs, Storey and Sorenson were ratably to share the expected commission. The letter referred to unmistak-

ably shows that, for the services originally performed by Sorenson, he must have believed a part of the compensation to be paid Kribs would be shared with him, and that he was only a subagent of the latter.

3, 4. This deduction, in our opinion, is not defeated by Kribs' reply to the inquiry, whereby he stated that, in giving Sorenson a plat of the lands and requesting him to procure a purchaser, he acted upon his general authority from the defendant. An objection was made to this answer after it was given; but no motion was made to strike it out. When a witness responds to a question before an attorney has had time to object to the inquiry, the proper practice is to move to strike out the answer, unless the court, in sustaining the objection, also directs the jury not to consider the reply given. The testimony referred to was not properly eliminated; but, in our opinion, the answer was a legal conclusion, and not the statement of a material fact. In any event, the reply to the inquiry does not show that Kribs undertook to bind his principal, nor does it negative the conclusion that he employed Sorenson as a subagent, with whom Smith sustained no relation as a contracting party: Mechem, Agency, § 197; *Barnard* v. *Coffin,* 141 Mass. 37 (6 N. E. 364, 55 Am. Rep. 443).

5, 6. The original offer to sell the land having been definitely limited, Storey's acceptance of the proposal made the period of time so stipulated of the essence of the agreement: *Watson* v. *Brooks,* 11 Or. 271 (3 Pac. 679); *Hardy* v. *Sheedy,* 58 Or. 195 (113 Pac. 1133). Where the employment of a broker is thus precisely fixed, his agency terminates with the end of the time specified: *Zeimer* v. *Antisell,* 75 Cal. 509 (17 Pac. 642); *La Force* v. *Washington University,* 106 Mo. App. 517 (81 S. W. 209).

7. Whatever the rule may be with respect to annulling a real estate broker's contract, it will be kept in

mind that Sorenson testified that he was directed by Kribs to continue his efforts to consummate a sale of the premises after the original option was declared canceled. Any services, however, that were performed pursuant to the latter order must be construed as acts done by a subagent at the command of an agent, and for the payment of which the principal would not be liable.

8. This conclusion leaves for consideration the question of Smith's acceptance of the purchase price that was partly paid, and his consummation of a valid bargain for the sale of the land, with full knowledge of the benefit which he probably derived from Sorenson's endeavor to procure a purchaser. When a principal, with entire comprehension of usurpation of authority by a person who pretends to act for him in dealing with his property, accepts the advantages which might accrue, he thereby ratifies the unwarranted conduct and renders himself liable for all the burdens that may result: *Hahn* v. *Guardian Assur. Co.,* 23 Or. 576 (32 Pac. 683, 37 Am. St. Rep. 709); *Connell* v. *McLoughlin,* 28 Or. 230 (42 Pac. 218); *Rumble* v. *Cummings,* 52 Or. 203 (95 Pac. 1111). Any unauthorized act by an agent for his principal that tends to impair the public health or to corrupt the public morals is void *ab initio,* and for that reason it is incapable of ratification, since any attempted approval of the transaction would necessarily be contaminated with the original illegality, thereby making the principal *in pari delicto* with the agent: Clark & Skyles, Agency, § 115. In the same section of the work referred to, it is said: "If, however, the act was one merely voidable in its nature, it may be subsequently ratified by the principal, although unauthorized." Another text-writer, in discussing this subject, observes: "An act, to be capable of ratification, must be voidable or defeasible only, and not void. That an act which could not have been authorized in

the first instance cannot be ratified seems clear, and upon this point the adjudications are in full accord'': Reinhart, Agency, § 98.

9. It is sometimes said that any unjustifiable conduct of one person in disposing of, or procuring property for, or prejudicial or beneficial to, the rights of another, which act could have been previously authorized by the latter, may subsequently be ratified by him. ˙ This observation is not universally applicable, for where a statute declares a particular act to be void, and its performance without authority is denounced as a misdemeanor in the enactment, which also prescribes a penalty upon conviction for a violation thereof, the word ''void,'' as thus used, is occasionally held to mean what its technical sense would imply, and not voidable, thereby rendering the unauthorized act incapable of ratification: 8 Words and Phrases, 7332. Thus, under a statute making it a misdemeanor on the part of a broker to earn a commission for the sale of real property without written authority, it was held that, in the absence of a writing of that kind, no action could be maintained: *Adler* v. *Schaumborger* (Sup.), 84 N. Y. Supp. 235; *Charles* v. *Arthur* (Sup.), 84 N. Y. Supp. 284; *Kronenberger* v. *Quinn* (Sup.), 86 N. Y. Supp. 139. It has also been ruled that, without such written authority, no recovery could be had on a *quantum meruit: Blair* v. *Austin,* 71 Neb. 401 (98 N. W. 1040); *Rodenbrock* v. *Gress,* 74 Neb. 409 (104 N. W. 758); *Barney* v. *Lasbury,* 76 Neb. 701 (107 N. W. 989); *Whiteley* v. *Terry,* 39 Misc. Rep. 93 (78 N. Y. Supp. 911).

Under a section of a statute of frauds declaring that ''no broker or real estate agent selling or exchanging land for or on account of the owner shall be entitled to any commission for the same, or exchange any real estate unless the authority for selling or exchanging such land is in writing, signed by the owner or his au-

thorized agent, and the rate of commission on the dollar shall have been stated in such authority," it was determined that, in the absence of a previous written contract, a subsequent written promise to pay the commission was without consideration and void: *Stout* v. *Humphrey*, 69 N. J. Law, 436 (55 Atl. 281); *Leimbach* v. *Regner*, 70 N. J. Law, 608 (57 Atl. 138); *Bagnole* v. *Madden*, 76 N. J. Law, 255 (69 Atl. 967). A different conclusion was reached in the case of *Muir* v. *Kane*, 55 Wash. 131, where, in construing a statute providing that any agreement authorizing a broker to sell or purchase real property for a commission should be void unless the contract or some note or memorandum thereof was in writing, it was decided that the performance of the services under an oral agreement, void under the statute of frauds, raised a moral obligation which was a sufficient consideration to support a subsequent written promise to pay the stipulated compensation. When an enactment expressly declares that an agreement for the payment of a commission for securing a purchaser of land is void, unless it is in writing and signed by the owner of the real property, the rule is well established that, in the absence of a written contract, a full performance of the services by the broker does not take the case out of the statute of frauds: *Myres* v. *Surryhne*, 67 Cal. 657 (8 Pac. 523); *Shanklin* v. *Hall*, 100 Cal. 26 (34 Pac. 636); *McGeary* v. *Satchwell*, 129 Cal. 389 (62 Pac. 58); *Dolan* v. *O'Toole*, 129 Cal. 488 (62 Pac. 92); *Beahler* v. *Clark*, 32 Ind. App. 222 (68 N. E. 613); *Price* v. *Walker*, 43 Ind. App. 519 (88 N. E. 78); *King* v. *Benson*, 22 Mont. 256 (56 Pac. 280); *Marshall* v. *Trerise*, 33 Mont. 28 (81 Pac. 400); *Blair* v. *Austin*, 71 Neb. 401 (98 N. W. 1040); *Rodenbrock* v. *Gress*, 74 Neb. 409 (104 N. W. 758); *Barney* v. *Lasbury*, 76 Neb. 701 (107 N. W. 989); *Gerard-Fillio Co.* v. *McNair*, 68 Wash. 321 (123 Pac. 462).

Our statute of frauds, providing that: ''In the following cases the agreement is void unless the same or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party to be charged, or his lawfully authorized agent; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law''—was amended February 9, 1909, by adding the following: ''An agreement entered into subsequent to the taking effect of this act, authorizing or employing an agent or broker to sell or purchase real estate for a commission or a compensation'': L. O. L., § 808. This supplemental clause went into effect after the original option referred to herein was given, but before the final bargain for the sale of the land was concluded.

A text-writer in discussing the phraseology of the common designation of a very celebrated English statute, enacted in 1677 (29 Car. II, c. 3), and which has been adopted in a more or less modified form in nearly all states of the Union, says: ''It may be said that an oral contract within the statute of frauds is not illegal or void, but is only voidable or nonenforceable. Such contracts have been likened to *nuda pacta*. The lack of a writing is merely a matter of evidence'': Reed, Stat. Frauds, § 678; 20 Cyc. 284. Such an enactment simply annexes the necessity of a writing to the common-law requirement that a contract must be based upon an adequate consideration: 20 Cyc. 281. While there is an irreconcilable conflict in the decisions with respect to the proper methods of ratifying the act of an agent, whose authority should originally have been in writing, it is believed that reason supports the rule that the approval by the principal of such act cannot be predicated upon the mere acceptance of the benefits of a bargain concluded for him; but, when the act is not declared by the statute to be a misdemeanor, the ratifi-

cation must be evidenced by a writing, which mode of proving the act is made by the statute indispensable: Reed, Stat. Frauds, § 382, and notes. An exception to this requirement exists in cases where possession of real property has been taken by a purchaser, who has made permanent and valuable improvements upon land pursuant to an oral contract to sell and convey the premises. This departure from the general precept is founded upon the principle that, unless specific performance was decreed in a suit instituted for that purpose, the purchaser could not be adequately compensated in an action at law to recover the damages sustained. Another reason is that, in suits to enforce the specific performance of an oral contract to convey land, the possession and betterment of which by a stranger to the title, when such occupancy and improvement are clearly traceable to the contract relied upon, afford indisputable evidence of the actual or constructive assent of the owner, thereby establishing the purchaser's right, and sufficient in law to take the case out of the statute of frauds: *Brown* v. *Lord,* 7 Or. 302; *Wagonblast* v. *Whitney,* 12 Or. 83 (6 Pac. 399).

The purpose sought to be accomplished by the enactment of the English statute mentioned was to prevent the practice of frauds which were supposed to be perpetrated, and to preclude a resort to perjuries which were believed to have been committed when oral contracts respecting certain matters could be enforced upon evidence existing only of the recollection of witnesses. It is thought that the primary object that induced the enactment of our statute, hereinbefore quoted, demands that, where the original contract respecting the broker's compensation was not in writing, as required, the ratification can only be by a writing The plaintiff's assignor never having been employed by Smith, nor the services rendered by Sorenson ratified in the manner indicated, it follows that error was

committed in refusing to direct a verdict for the defendant.

The judgment should therefore be reversed, and the action dismissed, and it is so ordered.

REVERSED.

Decided April 29, 1913.

ON PETITION FOR REHEARING.

(131 Pac. 1022.)

MR. JUSTICE MOORE delivered the opinion of the court.

It is maintained in a petition for rehearing that, since no exception was taken to the introduction of any testimony tending to establish the plaintiff's cause of action, errors were committed by this court in determining that the contract sued upon was within the statute of frauds and incapable of ratification by the defendant, except by the execution of some writing adopted for that purpose, and in concluding that the motion for a directed verdict in Smith's favor should have been allowed.

It was said in the former opinion that the request for a directed verdict, made after all the evidence had been reviewed, superseded the denial of a motion for a judgment of nonsuit interposed when the plaintiff introduced her testimony and rested in chief. Based on this deduction the petition states generally that it must be supposed that the court assumed a difference between the two motions and refused to apply to the request for a directed verdict the rules of law governing motions for a judgment of nonsuit. The latter motion probably called attention to the particular defect in the evidence whereby it was asserted that a cause of action had not been established sufficient to be submitted to the jury. The motion for the nonsuit having been denied, the deficiency in the evidence, to which notice had

been attracted, would be remedied if possible by the introduction of testimony on the particular subject.

10. A motion for a judgment of nonsuit and a motion for a directed verdict in the defendant's favor are tantamount to demurrers to the evidence, and the same rule for determining the sufficiency of the testimony is alike applicable to each. A motion for a directed verdict for the defendant, however, is generally less hazardous to the plaintiff's rights than is a motion for a judgment of nonsuit.

In the former opinion the testimony admitted without exception was deemed competent, and it was also considered that the statute of frauds as far as it related to Sorenson's employer was waived by not objecting to the admission of testimony tending to show that the contract sued upon was not evidenced by any writing. From an original examination of the entire transcript of the evidence it was not thought, nor from a re-examination thereof is it now believed, that the testimony so received without objection or exception, together with all the inferences and presumptions reasonably deducible therefrom, was sufficient to establish a cause of action to be submitted to the jury; because George Sorenson, the plaintiff's assignor, was employed by, and was the subagent of, F. A. Kribs, that no privity of contract existed between such substituted agent and the defendant Charles A. Smith, and the latter, never having stipulated in writing to pay a commission to the subagent, did not by negotiating the sale of the lands to C. P. Bratnober and the Storey-Bracher Lumber Company ratify Krib's employment of Sorenson.

We are compelled to adhere to the former opinion, and the petition for a rehearing is denied.

REVERSED: REHEARING DENIED.